893 So.2d 678 (2005)
DEPARTMENT OF CHILDREN AND FAMILIES, Appellant,
v.
P.K., Mother of N.K., D.K., S.S. and D.P., etc., Appellees.
No. 5D04-1682.
District Court of Appeal of Florida, Fifth District.
February 18, 2005.
*679 Ralph J. McMurphy, of Dept. Children & Families, Wildwood, for Appellant.
Candace A. Hawthorne, of the Hawthorne Law Firm, P.A., Tavares, for Appellee.
SHARP, W., J.
The Department of Children and Families appeals from an adjudicatory order and final judgment denying termination of the mother's parental rights to her four children. The Department argues that the trial court erred by conditioning termination on a requirement that the mother be permitted continued visitation rights with the children, following their adoption. Because the language of the final judgment and order do not reflect that the trial court conditioned termination on a visitation requirement,[1] we do not address that point. However, we agree with the Department that the final judgment is defective in various regards and we reverse.
A shelter petition and order in this case were filed October 27, 1999, and the children were placed with the Department the same day. Subsequently, the Department filed a dependency petition which alleged neglect and abuse by P.K. and the respective children's fathers.
A Florida Protective Services (FPS) Report stated that the children lived in conditions hazardous to their health. The house was filthy and the children had no clothes. A 1999 abuse report indicated that S.S. had cigarette burns on both arms, his back and his legs, and that he said his mother was responsible. A 1997 abuse report stated that there was no food in the house and only a couple of beers in the refrigerator. The home was full of trash, and the mother never took a bath. The children were kept up until midnight, and the mother often fell asleep while feeding the baby. The children were inadequately fed, supervised and lived in hazardous conditions.
The yard was full of broken glass, burned metal, and there was a burn pile within fifteen feet of the home. Bags of trash were in the yard, and the steps leading inside the residence were unstable *680 and had no hand rail. D.P. has a genetic defect, and must have follow-up treatment with a geneticist. Another report indicated that S.S. had scabies and impetigo.
P.K. pled no contest, and an order adjudicating the children dependent was filed on December 22, 1999. A case plan was submitted to the trial court on December 6, 1999, and at the disposition hearing, the case plan[2] was approved except for Task 3, which would have required P.K. to undergo psychological evaluation and comply with treatment recommendations. However, at a later judicial review hearing, P.K. was ordered to undergo a psychological evaluation and follow the recommendations of the therapist. The psychological evaluation was conducted on January 25, 2001 by Dr. Patrick Ward.
The Department filed a petition for termination of parental rights on January 8, 2002 and an amended petition was ordered at a judicial review hearing on December 10, 2002. At this hearing, the general master found that P.K. had had no contact with the children since December 26, 2001. The amended petition, filed on January 29, 2003, included a count for termination based upon abandonment.
Two hearings were held in this regard: one on February 9, 2004 and the other on April 5, 2004. At the time of the termination hearings, the children were in the Christian Care Residential Group Home, operated by the First Baptist Church of Leesburg. S.S. has an anger management problem and is receiving counseling. Mr. McElroy, the Director of the Home, testified he had seen definite improvement in S.S.'s anger control problem. McElroy and the Guardian ad Litem (GAL) agreed that the children are adoptable.
Various witnesses testified at the termination hearings. Melissa Quinones, a Family Services Counselor for the Department testified that P.K., only provided her with one pay stub for $100.00, dated September 9, 2003. The Department views income as sufficient where there is a minimum of 40 hours of work per week. P.K. would qualify for food stamps and the children would have Medicaid and other services for which P.K. could apply. Further, P.K. would get additional money because D.P. is disabled,[3] and she would get social security. However, P.K. is not working for the company for which she provided the pay stub.
P.K. had leased a one bedroom home which she shared with her grown daughter H.K., her grandchild and H.K.'s husband. The Department's adequate housing guidelines, for a family of five is three bedrooms. P.K. had not complied with paying child support at all. Although there had been a psychological evaluation with Dr. Ward, there had been no follow-up despite his recommendation for intense, long-term counseling.
To Quinone's knowledge, P.K. had failed to comply with the requirement that she not cohabit with men known to have a criminal record. In fact, Quinones testified P.K. had been living with a felon for several months to a year.
*681 P.K. went to parenting classes and completed them; but it was also recommended that she attend additional classes. As a result, she took fifteen weeks of parenting classes through the Bridges Program.
Throughout the five years of the case plan, P.K. has had continual problems with stable employment, stable housing and the payment of child support. Quinones said the biggest obstacles to reunification are parenting, stable housing and employment. She said she believes the children are adoptable and believes it is in the children's best interest if termination occurs.
Dr. Ward testified that he is concerned about P.K.'s level of denial and lack of insight. He concluded:
Given the client's current level of denial and her apparent impaired insight, the client is in need of intensive counseling, which likely will be required to be long term, in the evaluator's opinion. Even then, the prognosis is likely to be poor as the client's defensiveness appears to be well established and crystallized.
P.K. also lacked responsibility, denied the situation and denied her accountability. Dr. Ward diagnosed P.K. as Axis 5, depressive disorder not otherwise specified, and child abuse with her being the perpetrator; as well as Axis 2, with a personality, character or logic issue, dependent passive/aggressive, and possible paranoid traits. He could not recommend any change with the children based on what he had seen, and said that P.K. had a pattern of having relationships that were potentially harmful to the children.
P.K. also testified at the hearings. She came to Florida in a van with eight people, two dogs and four cats. She took only clothing, no furniture, and had less than $100.00 at the time. At first the family lived in the van, but then moved in with a stranger, who lived in a trailer. P.K. testified she did not know his last name. The children slept on the floor. She said she was there about a month, when the Department came and took the children.
She said she got a job with Florida Extruders and made $7.00 an hour. She rented a house with three bedrooms and lived there alone. She stayed for about one year and left because she could no longer afford a home. She has lived in three different places since then, moving in with people that she worked with. She lost her job because she took off too much time coming to court and visiting the children. On October 11, 2002, she moved in with her adult daughter, H.K. She now lives in a house divided into four different apartments. Her apartment has two bedrooms. The rent is $360.00 per month.
P.K. testified she is not a stable person with jobs, but stays on them at least six months. If she finds that a job is not "worth it," she won't stay. Since Florida Extruders, she has had six different jobs. She last worked for Klean Rite for six months, but they told her to leave and she left on November 18, 2003. On February 9, 2004, the day of the hearing, she had just obtained another job at Perkins Restaurant as a hostess for $6.15 an hour. She said she had been able to pay her rent and other expenses while unemployed for three months because she saved her money. She had purchased a truck a month ago and paid $500.00 cash for it from her savings. She agreed she had not paid any child support, but said she had given her children money directly.
The GAL, Winifred Luche, testified that the children were very well adjusted, and that two of the children have special needs. D.P.'s skull is growing through and penetrating her optic nerve. S.S. has serious anger management problems. But she expressed the view that all of these children were adoptable, agreeing with the six case-workers *682 and the former GAL that adoption is appropriate.
The judge concluded that under section 39.810, it would not be in the manifest best interest of the children to terminate P.K.'s parental rights. However, he also concluded that the Department had shown that P.K. had failed to complete her plan within twelve months. § 39.601(7), Fla. Stat.
The court found that it was likely that N.K., 16 years old at the date of the hearing, and D.K., 14 years at the date of the hearing, would continue in the independent living program. It found that D.P., at the age of 10 years, was likely to be adopted, and that S.S., 13 years, would remain in long-term foster care upon termination.
In its written order, the court found by clear and convincing evidence that P.K. had failed to comply with all significant requirements of her case plan, i.e., housing, stable employment and refraining from cohabiting with men who posed a danger to her children. The court considered the eleven factors in section 39.810 and found they all supported termination, save one: the depth of attachment between the mother, P.K., and the children, and the desire of three of the children to return home. However, the court also found there would be no harm to the children as a result of termination.
The finding which weighed against termination (in part) was as follows:
The love, affection and other emotional ties existent between the children and their mother ... is great. The court believes that there would be no harm to the children that would arise from the termination of parental rights and duties. The court requested that DCF allow the mother visitation with the children after adoption in order to grant a termination of the mother's rights, however, DCF could not find legal authority to do so.
In denying termination, the court ordered P.K. to complete all of the tasks of her case plan and gave her an additional six months to do so.
We cannot say the trial judge breached his discretion in that regard. However, we do find that he failed to address each child individually in the final judgment even though each child presents different characteristics and an individual situation. Thus, we reverse and remand this cause for proper fact findings and conclusions of law.
On remand, the question of what to do with these four children will come before the court again, a few months later than projected by the court in its order denying termination. The trial court should take additional testimony regarding the mother's completion of her case plan, vel non, and the specific situation and status of each child. and, it should make specific findings as to each child.
We do not intend by this opinion to require the trial court to render an order terminating the mother's parental rights, as to some or all of the children, or to require it to make other specific permanency arrangements pursuant to statute, which may be appropriate for these children. However, because the children have been in the custody of the Department for more than four years, the trial court should, on remand, make specific findings as to each child and reach the best permanency disposition in each child's best interest. Adoption, licensed custody, and independent living are all possible options for some of these children and the disposition need not be the same for all four.
REVERSED and REMANDED.
*683 PLEUS, J., concurs.
GRIFFIN, J., concurs specially with opinion.
GRIFFIN, J., concurring.
I concur because, given our disposition, we do not yet need to reach the question whether the trial court's refusal to terminate parental rights was an abuse of discretion. Although he did not include it in his order, the trial judge orally communicated that his refusal to terminate parental rights was predicated on the Department's negative response to his request that the mother have continued visitation after termination. It is unclear how the Department could have done what the judge wanted. Given the record in this case, it at least explains what otherwise might be inexplicable.
NOTES
[1] We agree with the Department that such a provision would not be legally enforceable. See section 63.172 (adoption terminates all legal relationship between the adopted person and the adopted person's relatives, including the birth parents, even if nonconsenting, and creates a relationship between the adopted person and the petitioner that would have existed if the adopted person were a blood descendent of the petitioner); L.J.R. v. T.T., 739 So.2d 1283, 1285 (Fla. 1st DCA 1999).
[2] The task plan required P.K. to: obtain and keep employment; pay child support; wash the children's clothes and deliver them to the counselor for the children; maintain a clean safe home with working utilities; apply for subsidized housing; refrain from cohabiting with men who had criminal or abuse histories; provide the Department with the names of social service agencies involved with the family, and schools attended by the children in Pennsylvania and West Virginia; and sign a release of information concerning P.K. and the children.
[3] Mike McElroy, Director of the home where the children are staying, said D.P. is legally blind.